UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JANE DOE, on behalf of her minor
child, SARAH DOE,

               Plaintiffs,                     **DECISION AND ORDER**

               v.                         6:25-CV-06599 EAW

WEBSTER CENTRAL SCHOOL
DISTRICT, BRIAN NEENAN,
MARGARET CALLAHAN, M.D., and
CHRIS CALLAHAN,

               Defendants.
_____

## <u>INTRODUCTION</u>

This case involves claims that a minor child has been excluded from the sixth grade because she is disabled—because she cannot receive the necessary Tdap vaccine due to existing medical conditions.  Her mother is the plaintiff who has brought the claim on the child's behalf, and she seeks a preliminary injunction allowing her daughter to attend school.  In support of her request, she relies on two medical exemption forms completed by two doctors—both of whom are purportedly the minor child's treating physicians even though one is located in Florida and the other is located about 80 miles away.  Neither exemption form is sworn to under oath, and neither is supported by independent medical proof.  By contrast, the school district has submitted sworn statements from medical professionals.  Because the requisite standard for a preliminary injunction has not been

met, and because a child is not entitled to a vaccine exemption just based on a doctor's "say-so," the motion (Dkt. 4) is denied.

## PROCEDURAL BACKGROUND

Plaintiff Jane Doe ("Plaintiff"),[1] on behalf of her 11-year-old daughter Sarah ("Sarah") commenced this action on October 22, 2025, against defendants Webster Central School District ("Webster CSD"), its superintendent Brian Neenan, its school physician Margaret Callahan, M.D. ("Dr. Callahan"), and the principal of Spry Middle School ("Spry") Chris Callahan (collectively "Defendants"), alleging that Sarah was wrongfully excluded from the sixth grade.  Plaintiff alleges the following causes of action: (1) discrimination in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 (first cause of action); (2) discrimination in violation of section 504 of the Rehabilitation Act (second cause of action); and (3) an Article 78 proceeding for violation of New York Public Health Law § 2164(8) in the nature of mandamus to compel (third cause of action).  (Dkt. 1).[2]  Within days of commencing this action, Plaintiff filed a motion for a temporary restraining order ("TRO")[3] and preliminary injunction, seeking to allow Sarah to attend Spry and participate in all school-related programs and activities.

---

[1]     The Court has granted Plaintiff's application to proceed by pseudonym.  (Dkt. 24).

[2]     Neither Title II of the ADA nor § 504 of the Rehabilitation Act provide for individual capacity suits against state officials.  *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001).  Thus, to the extent Plaintiff sues any defendant in their individual capacity under those statutes, the claims are not sustainable.

[3]     At an initial telephone conference on October 29, 2025, the Court declined to issue an immediate TRO, and so the pending request for relief is Plaintiff's application for a preliminary injunction.

(Dkt. 4).  The Court set an expedited briefing schedule (Dkt. 10), and Defendants filed papers in opposition to the pending motion on November 7, 2025 (Dkt. 13), with Plaintiff filing reply papers on November 11, 2025 (Dkt. 15).  Oral argument was held on November 18, 2025, at which time the Court reserved decision.  (Dkt. 21).  On December 5, 2025, the Court requested further briefing on the extent to which the Second Circuit's decision in *Goe v. Zucker*, 43 F.4th 19 (2d Cir. 2022), impacted Plaintiff's claims under the ADA and Rehabilitation Act.  (Dkt. 25).  Plaintiff filed her memorandum on December 12, 2025 (Dkt. 28), with Defendants filing their memorandum on December 19, 2025 (Dkt. 30).

## **FACTUAL RECORD**

At oral argument, Plaintiff's counsel stated that he was not requesting an evidentiary hearing.  Thus, the facts as set forth here are taken from the submissions by the parties. Where there is disagreement, it is noted.

Sarah was excluded from school on September 16, 2025, after her request for an exemption from the Tdap[4] vaccine was denied.  (Dkt. 1 at ¶ 4; *see* Dkt. 4-2 at ¶ 7; Dkt. 4-5).  Plaintiff cites the following in support of her claimed "documented and severe medical history of adverse, escalating, and inflammatory reactions to vaccinations" (Dkt. 1 at ¶ 16):

- ■ In 2019, about one week after receiving the Tdap and MMR vaccines[5] on the same day, Sarah became "violently ill with a very high fever, her body broke out

---

[4]    The Tdap vaccine is intended to prevent tetanus (T), diphtheria (D), and pertussis (aP) (also known as "whooping cough").  *See* U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/vaccines/hcp/current-vis/dtap.html (last visited Dec. 27, 2025).

[5]    According to Sarah's vaccine records submitted by Defendants, it was actually the DTap-IPV and MMRV vaccines that she received in 2019.  (Dkt. 13-15 at 2).

in hives, and she suffered from chest congestion, projectile vomiting, and diarrhea." (*Id.* at ¶ 17). Plaintiff has submitted a declaration attesting to this alleged vaccine reaction (Dkt. 4-2 at ¶ 2), but there are no medical records documenting the incident.

■ In September 2022, Sarah was hospitalized for four days, at Golisano Children's Hospital in Rochester, New York, in the Pediatric Intensive Care Unit (PICU), with a discharge diagnosis of Multisystem Inflammatory Syndrome (Mis-C) and septic shock. (Dkt. 1 at ¶ 18). The discharge summary submitted by Plaintiff shows that this occurred as the result of an asymptomatic COVID-19 infection, not after administration of a vaccine. (Dkt. 6). In fact, the most recent vaccines received by Sarah before this hospitalization occurred more than two years earlier. (Dkt. 13-2 at ¶ 33; Dkt. 13-12 at ¶ 26).

■ Sarah has been diagnosed with a MTHFR gene mutation, that Plaintiff alleges is a genetic condition that impairs Sarah's "ability to detoxify." (Dkt. 4-2 at ¶ 4). There are no medical records submitted in support of this diagnosis.

A medical exemption form was completed by Joseph A. Riccione, D.O., a New York State licensed physician with an office in Williamsville, New York,[6] dated August 25, 2025,[7] stating that Sarah should be exempt from the DTaP, DTP, and Tdap vaccines because:

[Sarah] has a genetic . . . MTHFR Deficiency. This interferes with biotransformation of immunizations, and their preservatives/adjuvants, resulting in increased toxicity. This makes the risk of harm outweigh the benefit of vaccination.

---

[6]     Williamsville, New York, is located in the western part of the District, about 80 miles from Webster, New York.

[7]     According to the declaration submitted by Ginger Anderson, BSN, RN, the Nurse Coordinator for the Webster CSD, Plaintiff was notified four times between May 2 and August 13, 2025, that Sarah needed proof of a Tdap vaccine before entering sixth grade. (Dkt. 13-2 at ¶ 10; Dkt. 13-4). Yet, it was not until one business day before the start of the school year that Plaintiff submitted the medical exemption form from Dr. Riccione. (Dkt. 13-2 at ¶ 12).

(Dkt. 4-4).  By letter dated September 2, 2025, the Webster CSD advised Plaintiff that the request for medical exemption from immunization for the Tdap vaccine was denied because "[p]er Advisory Committee on Immunization Practices (ACIP) precautions and contraindications guidance, MTHFR Deficiency is not a contraindication to receiving the Tdap vaccine."  (Dkt. 4-5).

Another medical exemption statement was completed by Jerry J. Cattelane, Jr., D.O., a New York State licensed physician with an office in Lake City, Florida, dated September 25, 2025, stating that Sarah should be exempt from the DTaP, DTP, and Tdap vaccines because:

> Hypersensitivity to vaccines (Z88.7), allergies with adverse reactions (T78.40).  Patient had life threatening, multi-organ failure after vaccinations.[8]  Further vaccination is absolutely contraindicated.

(Dkt. 4-7).  In response to that submission, the Webster CSD communicated a request for additional information supporting this new request for an exemption as follows:

> [W]hich vaccinations [Sarah] received prior to the 'life threatening, multi-organ failure,' when those vaccinations were received, and when the 'life threatening, multi-organ failure occurred.  We also request that you provide additional information regarding the nature and extent of [Sarah's] 'hypersensitivity to vaccines,' and 'allergies with adverse reactions,' as well as the timing of such reactions in relation to the receipt of specific vaccinations.

---

[8]    Despite this statement, Plaintiff has submitted no medical records supporting a conclusion that Sarah experienced life-threatening organ failure during the hospitalization in September 2022.  The discharge summary submitted by Plaintiff does not mention organ failure.  (*See* Dkt. 6).  And even Plaintiff's declaration does not claim that Sarah experienced organ failure, but that "medical staff informed us she was facing *potential* organ failure."  (Dkt. 4-2 at ¶ 3).  And, as noted above, the most recent vaccines received by Sarah before this hospitalization occurred more than two years earlier.  (Dkt. 13-2 at ¶ 33; Dkt. 13-12 at ¶ 26).

(Dkt. 4-12).  No further information was submitted from either Dr. Riccione or Dr. Cattelane in response to this request.  Instead, Plaintiff's counsel responded to the inquiry by referencing Sarah's September 2022 hospitalization, enclosing the discharge summary from that hospitalization, referencing Sarah's 2019 illness, and referencing the MTHFR gene mutation.  (Dkt. 4-13).  The Webster CSD responded by letter October 20, 2025, denying this second request for exemption, stating as follows:

> According to the ACIP contraindication and precautions guidance, a febrile reaction 3-4 days after receipt of MMR and Tdap vaccines, and MTHFR gene mutation are not contraindications to receiving the Tdap vaccine.  A history of MIS-C and septic shock not temporally associated with a prior Tdap vaccine within 7 days are not contraindications to receiving the Tdap vaccine.

(Dkt. 4-14 at 1).

Neither of the medical exemption forms was completed by Sarah's treating pediatrician, noted in the medical records as the Culver Medical Group.  (*See* Dkt. 6 at 1-2; *see also* Dkt. 13 at ¶ 19).  Plaintiff also references the Culver Medical Group as Sarah's pediatrician in her declaration.  (Dkt. 4-2 at ¶ 12).  And records previously completed by Culver Medical Group noted no health issues, contraindications, or precautions related to vaccines.  (Dkt. 13-2 at ¶ 35; Dkt. 13-11; Dkt. 22).  Yet during oral argument Plaintiff's counsel represented that Sarah was no longer treating with the Culver Medical Group and that Dr. Riccione was her primary medical care provider.  Plaintiff's counsel also contends in a supplemental submission that Dr. Cattelane—who again, is located in Florida—is Sarah's treating physician.  (Dkt. 28 at 3).  Neither Dr. Riccione nor Dr. Cattelane is a pediatrician.  (Dkt. 13 at ¶¶ 8, 17).

Defendants have submitted declarations from Dr. Callahan, a pediatrician currently serving as School Physician for the Webster CSD, and Ginger Anderson, BSN, RN, Nurse Coordinator for the Webster CSD ("Nurse Coordinator Anderson"), establishing that neither of the medical exemption requests provided a medical contraindication or precaution, specific to the Tdap vaccine, that was consistent with ACIP guidelines. (Dkt. 13-2 at ¶¶ 20-26; 36; Dkt. 13-12 at ¶¶ 10-17; 27). MTHFR Deficiency, identified as the basis for the requested exemption by Dr. Riccione, is not listed as a medical contraindication or precaution for the Tdap vaccine by ACIP. (Dkt. 13-2 at ¶ 21; Dkt. 13-6 at 5; Dkt. 13-12 at ¶¶ 10-11). Nor did Dr. Riccione "reference any other 'nationally recognized evidence-based standard of care' that included MTHFR Deficiency as a medical contraindication or precaution" for the Tdap vaccine. (Dkt. 13-2 at ¶ 22; *see also* Dkt. 13-12 at ¶ 12). And according to the declaration from Nurse Coordinator Anderson, none of the FDA Package Summaries and Package Inserts for any Tdap vaccine formulation includes MTHFR Deficiency as a contraindication, warning or precaution. (Dkt. 13-2 at ¶ 26).

As for the second medical exemption completed by Dr. Cattelane, Dr. Callahan explains in her sworn declaration:

> Fever 3-4 days after receiving MMRV and DTap-IPV vaccines, a MTHFR gene mutation, and a history of MIS-C and septic shock not temporally associated with a prior TDaP vaccine within 7 days are not contraindications to receiving the TDaP vaccine under the ACIP Guidance, nor any other nationally recognized, evidence-based standards of care.

(Dkt. 13-12 at ¶ 27).

## ANALYSIS

### I.    Applicable Legal Standards

#### A.    Preliminary Injunction

To obtain a preliminary injunction like the one sought here that "will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021) (quoting *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020)).[9] "The movant must also show that the balance of equities supports the issuance of an injunction." *Id.* at 280 (citing *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020)).   A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).   The Court "has wide discretion in determining whether to grant a preliminary injunction[.]" *Id.* at 511.

---

[9]     Plaintiff argues that she has met this standard, but also that the likelihood of success prong may be satisfied by "showing 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" (Dkt. 4-1 at 8 (quoting *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)). Plaintiff's statement is inconsistent with Second Circuit caselaw on the subject. *See We the Patriots USA, Inc.*, 17 F.4th at 279 n.13 ("[W]e have consistently applied the likelihood-of-success standard to cases challenging government actions taken in the public interest pursuant to a statutory or regulatory scheme. . . ."). But even if the less stringent standard applied, it would not change the result here.

"The irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction," and thus it must "be satisfied before the other requirements for an injunction can be considered." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (quotations and citations omitted). The Second Circuit has explained that "to satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotations, citations, and alterations omitted). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Id.*

## B.    New York State Public Health Law

Under New York Public Health Law § 2164(7)(a), no child may attend school in excess of 14 days without evidence of the child's immunization against specified diseases, including tetanus, diphtheria, and pertussis (whooping cough). A child may be exempted from school immunization if "any" state-licensed physician "certifies that such immunization may be detrimental to [the] child's health. . . ." N.Y. Pub. Health Law § 2164(8). Regulations issued by the New York State Department of Health ("DOH") "require use of a medical exemption form approved by the Health Department . . . completed and signed by a physician, certifying that 'immunization may be detrimental to the child's health.'" *Goe v. Zucker*, 43 F.4th 19, 26 (2d Cir. 2022) (quoting 10 N.Y.C.R.R.

§ 66-1.3(c)).  In completing the form, the physician "must provide 'sufficient information
to identify a medical contraindication to a specific immunization and specify[] the length
of time the immunization is medically contraindicated.'"  *Id.*  The regulations "also define
the phrase '[m]ay be detrimental to a child's health,' as used in section 2164(8) of the New
York Public Health Law, to mean 'that a physician has determined that a child has a
medical contraindication or precaution to a specific immunization consistent with ACIP
guidance or other nationally recognized evidence-based standard of care.'"  *Id.* (quoting 10
N.Y.C.R.R. § 66-1.1(l)).

> The ACIP Guidelines define a "contraindication" as a "condition[ ] in a
> recipient that increases the risk for a serious adverse reaction," and
> recommend that a vaccine not be administered when such a contraindication
> exists.    Examples    of    contraindications    include    being    severely
> immunocompromised, having an immunodeficiency disease, or suffering a
> severe allergic reaction after a previous vaccine dose.  The ACIP Guidelines
> separately define a "precaution" as a "condition in a recipient that might
> increase the risk for a serious adverse reaction, might cause diagnostic
> confusion, or might compromise the ability of the vaccine to produce
> immunity."  For precautions, the ACIP Guidelines recommend deferring, in
> lieu of completely foregoing, vaccination. Examples of precautions include
> experiencing moderate or severe acute illness or a personal or family history
> of seizures.

*Id.* (citations omitted) (*see also* Dkt. 13-6).

### C.    ADA and Rehabilitation Act

"[B]oth Section 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended, 29
U.S.C. § 794, and Title II of the Americans with Disabilities Act of 1990 (ADA), 104 Stat.
337, as amended, 42 U.S.C. § 12131 *et seq*., prohibit discrimination on the basis of
disability in a wide variety of contexts."  *A. J. T. by & through A. T. v. Osseo Area Sch.,
Indep. Sch. Dist. No. 279*, 605 U.S. 335, 339 (2025).  "Section 504 of the Rehabilitation

Act provides: 'No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" *Id.* (quoting 29 U.S.C. § 794(a)). "Similarly, under Title II of the ADA, 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Id.* (quoting 42 U.S.C. § 12132).

Although there are "subtle distinctions" between the Rehabilitation Act and the ADA, both statutes seek to prevent discrimination based on disability and, as a result, courts generally apply the same legal standard for claims arising under Title II of the ADA and section 504 of the Rehabilitation Act. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). To establish a prima facie violation of either statute, a plaintiff must show: (1) she is a qualified individual with a disability; (2) the defendant is subject to the ADA or Rehabilitation Act; and (3) she was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant, by reason of her disability. *Id.*

"Both statutes define a 'disabled individual' as one who '(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.'" *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002) (quoting 29 U.S.C. § 705(20)(B) and 42 U.S.C. § 12102(2)).

- 11 -

In determining whether an individual has a disability for purposes of the ADA and the Rehabilitation Act, a plaintiff must:  (1) "show that she suffers from a physical or mental impairment"; (2) "identify the activity claimed to be impaired and establish that it constitutes a 'major life activity'"; and (3) "show that her impairment 'substantially limits'" the major life activity identified.  *Id.*  As relevant here, the Equal Employment Opportunity Commission has identified, for ADA purposes, physical impairment as including "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine. . . ." 29 C.F.R. § 1630.2(h).  Those same regulations identify "major life activities" as including "[t]he operation of a major bodily function, including functions of the immune system. . . ."  *Id.* at § 1630.2(i).  *See* 29 U.S.C. § 20(B) (for Rehabilitation Act purposes defining "individual with a disability" as "any person who has a disability as defined in [the ADA]" subject to certain exceptions not relevant here).

## D.    <u>Article 78</u>

An Article 78 proceeding is a creature of state law, and it is generally inappropriate for a federal district court to exercise supplemental jurisdiction over such a claim.  *See, e.g.*, *Crown Castle Fiber LLC v. City of Rochester*, 623 F. Supp. 3d 165, 177 (W.D.N.Y. 2022) (collecting cases); *Bartolini v. Cassels*, No. 17-cv-5671 (NSR)(PED), 2018 WL 3023161, at *6 (S.D.N.Y. June 18, 2018) ("District Courts in this Circuit have consistently declined to exercise supplemental jurisdiction over Article 78 claims.") (collecting cases);

*Nitti v. Cty. of Tioga*, No. 3:14-CV-0954 (GTS/DEP), 2015 WL 5708637, at *9 (N.D.N.Y. Sept 28, 2015) ("Courts have found that compelling reasons to decline to exercise supplemental jurisdiction exist in the very nature of an Article 78 proceeding[.]") (quotations omitted); *Riddles v. Sallie Mae*, No. 08-CV-1499 (NG), 2009 WL 3734302, at *2 (E.D.N.Y. Nov. 4, 2009) ("[O]nly the New York state courts have jurisdiction over Article 78 proceedings."); *Beckwith v. Erie Cty. Water Auth.*, 413 F. Supp. 2d 214, 226-27 (W.D.N.Y. 2006) ("[T]his court has no original or supplemental subject matter jurisdiction over [an] Article 78 proceeding as neither federal nor New York state law empower the federal courts to consider such claims, and, under New York law, authority to grant relief pursuant to an Article 78 proceeding is exclusively vested in New York Supreme Court.").

## II.    Sarah's Exclusion from School Constitutes Irreparable Harm

In support of the claimed irreparable harm, Plaintiff argues that the denial of educational opportunities to a child constitutes irreparable harm. (Dkt. 4-1 at 14). Because Sarah has been barred from attending school since September 16, 2025, Plaintiff contends that this prong of the preliminary injunction analysis is satisfied. (*Id.* at 15). Defendants respond to Plaintiff's irreparable harm argument by contending that options of home schooling or relocating outside the state are available and thus negate the irreparable harm cited by Plaintiff. (Dkt. 13-18 at 6).

The Court is not persuaded by Defendants' proffered alternatives. Rather, the Court agrees with other courts in this Circuit (including at least one in this District) that have found that excluding school-aged children from attending classes constitutes irreparable harm. *See A.A.C. on behalf of G.C. v. Starpoint Cent. Sch. Dist.*, No. 24-CV-1047 (JLS),

2025 WL 1201971, at *20 (W.D.N.Y. Apr. 25, 2025) (collecting cases), *appeal pending*, No. 25-1316 (2d Cir.); *see also Doe v. Oceanside Union Free Sch. Dist.*, No. 25-CV-06214(JS)(SIL), 2025 WL 3706756, at *4 (E.D.N.Y. Dec. 22, 2025) ("Loss of education has been held to be a form of irreparable harm.").

III.    **Plaintiff Fails to Show Likelihood of Success**

Despite the finding of irreparable harm, Plaintiff's motion falters when considering her likelihood of success.  That is because the Court concludes that Plaintiff has failed to demonstrate a likelihood of success with the federal claims under the ADA and Rehabilitation Act, and without those claims the Court would decline to exercise supplemental jurisdiction over the Article 78 state court proceeding.

Plaintiff contends that Sarah is a qualified individual with a disability for ADA and Rehabilitation Act purposes because "[s]he has severe physical impairments—including a compromised immune system, a history of septic shock and multi-system inflammatory syndrome, and an MTHFR gene mutation—that substantially limit one or more major life activities."  (Dkt. 1 at ¶ 66; *see also id.* at ¶ 56 (alleging for ADA claim that Sarah's physical impairments "impair[] her ability to detoxify" and that the major life activities impacted include "the normal functioning of her immune system, circulatory system, and major bodily organs.")).  Plaintiff's counsel summarized the position at oral argument:  Sarah is immunocompromised because she has a gene mutation that prevents her from detoxifying when administered certain vaccines or when she became infected with the virus causing COVID-19, thus making it dangerous for her to be administered the Tdap vaccine.  Plaintiff expanded upon the purported medical issues in her supplemental submission, claiming

(apparently for the first time) that Sarah suffers from "a history of 'encephalopathy' or 'progressive or unstable neurologic disorders'" (Dkt. 28 at 2), and that she suffers from "dysregulated immune system capable of attacking her own organs" (*id.* at 3).

But the evidence in the record before this Court does not support Plaintiff's claims. As Dr. Callahan states in her sworn declaration, there is absolutely no medical proof to support Plaintiff's claim that Sarah is immunocompromised. (Dkt. 13-12 at ¶ 28). And while Plaintiff's counsel has repeatedly argued that Sarah is "immunocompromised," neither Dr. Riccione nor Dr. Cattelane use that term in their medical exemption forms. (Dkt. 4-4; Dkt. 4-7). *See Buotote v. Illinois Tool Works, Inc.*, 815 F. Supp. 2d 549, 557 (D. Conn. 2011) ("Courts in the Second Circuit have consistently held that when a plaintiff fails to offer any medical evidence substantiating the specific limitations to which he claims he is subject due to his conditions, he cannot establish that he is disabled within the meaning of the ADA." (citations omitted)).

Plaintiff relies on three points to support her claims as to Sarah's current medical condition and claimed disability, but considered in either isolation or together, they simply do not lead to a conclusion that Plaintiff has met the requisite clear showing that a preliminary injunction should be issued. In other words, the Court concludes that Plaintiff is unlikely to succeed on her claim that she suffers from a physical or mental impairment that substantially limits a major life activity. *See Cecere v. Canisius Univ.*, No. 1:24-CV-00155 EAW, 2025 WL 712748, at *5 (W.D.N.Y. Mar. 5, 2025) ("courts in this circuit have repeatedly rejected claims that a reaction to the COVID-19 vaccine rises to the level of a disability under the ADA"), *aff'd*, No. 25-798-CV, 2025 WL 3239732 (2d Cir. Nov. 20,

2025); *Perez v. New York Presbyterian/Weill Cornell Med. Ctr.*, No. 23-CV-6152 (CS), 2024 WL 1514216, at *4-6 (S.D.N.Y. Apr. 8, 2024) (rejecting claims that reaction to flu vaccine and family history of reactions to COVID-19 vaccine satisfied requirements for establishing disability under the ADA and collecting similar cases).

With respect to the alleged adverse reaction in 2019, the claim is entirely anecdotal—Plaintiff has submitted no medical proof in support of this allegation. And according to the sworn declaration from Dr. Callahan, not only do the alleged reactions cited by Plaintiff fail to suggest a compromised immune system, but the reactions cited are not medically associated with the Tdap vaccine for which the exemption is sought. (Dkt. 13-12 at ¶¶ 29-33). In response to Dr. Callahan's sworn statements, Plaintiff has submitted no evidence, let alone evidence in the form of sworn statements from a licensed physician. Instead, Plaintiff relies on the exemption forms completed by Dr. Riccione and Dr. Cattelane, but neither contains a sworn statement from the doctors nor do the statements provide independent proof of the claimed adverse reaction in 2019. Put another way, it is a mystery as to what Dr. Riccione and Dr. Cattelane relied on (if anything) related to the alleged 2019 incident.

Thus, the record of sworn proof on this point consists of Plaintiff's sworn statement that in 2019, approximately one week after being administered vaccines, Sarah became ill; and Dr. Callahan's sworn statement that these conditions allegedly experienced by Sarah in 2019 do not indicate "a compromised immune system," are "not medically associated with the TDaP vaccine for which [Sarah] now seeks an exemption," and "are not

contraindications to receiving the TDaP vaccine under the ACIP Guidance, nor any other nationally recognized, evidence-based standards of care." (Dkt. 13-12 at ¶¶ 27, 30-32).

As for the 2022 hospitalization, the evidence in the record supports a conclusion that this resulted from an asymptomatic COVID-19 infection. Nothing in the record supports the conclusion that the Mis-C and septic shock diagnosis stemmed from a vaccine (the most recent of which had been administered over two years earlier). Further, despite the claim that Sarah experienced "life threatening, multi-organ failure," (Dkt. 4-7), the discharge summary does not mention organ failure (Dkt. 4-13 at 3-9). To be sure, Sarah's hospital stay appears to have been a serious situation, but the proof in the record does not support a conclusion that this means she is a qualified individual with a disability—that she has a physiological disorder or condition affecting one or more body systems that substantially limits a major life activity. Dr. Callahan's sworn declaration states that the diagnosis as a result of the 2022 hospital stay was not "in any way related to [Sarah's] previous vaccinations, the most recent of which had been given more than two years prior to her hospital admission." (Dkt. 13-12 at ¶ 26). And nothing in the record supports the conclusion that a MTHFR gene mutation caused this reaction. Neither of the unsworn statements from Dr. Riccione or Dr. Cattelane contain a statement that Sarah's MTHFR gene mutation caused her reaction to COVID-19 in 2022, requiring the hospital stay. (*See* Dkt. 4-4; Dkt. 4-7). Rather, this is Plaintiff's counsel's argument, but that is not proof.

In addition, even if Plaintiff could show that Sarah was a qualified individual with a disability under the ADA and Rehabilitation Act, Plaintiff has failed to establish a likelihood of success in proving that Sarah was discriminated against *because of* her

- 17 -

disability.  In her supplemental submission, Plaintiff contends that Sarah was excluded "precisely because of her disability," citing to "a documented physiological impairment— a history of 'life threatening, multi-organ failure,' 'Septic Shock,' and 'Mis-C'—that renders the administration of this specific booster a direct threat to her life." (Dkt. 28 at 1-2).  But Plaintiff's argument in this regard faces the same problem as the one related to whether she is a qualified individual with a disability—there is insufficient proof in the record to support Plaintiff's claims.

The record in this case shows that Defendants have not denied Sarah admission to school because of her purported disability.  Rather, the record supports a conclusion that Sarah was denied admission because she "failed to comply with the [Public Health Law] procedures, which . . . are reasonably related to furthering a legitimate state objective." *Goe*, 43 F.4th at 36.  In other words, Defendants concluded that neither of the medical exemption forms submitted on Sarah's behalf met the criteria under the DOH regulations to show that Sarah has a medical contraindication or precaution to the Tdap vaccine consistent with ACIP guidance or other nationally recognized evidence-based standard of care.  And based on the Second Circuit's decision in *Goe*, the regulations pass muster, including those requiring that the medical exemption form completed by the physician contain "sufficient information to identify a medical contraindication to a specific immunization," and that the school "may require additional information supporting the exemption."  10 N.Y.C.R.R. § 66-1.3(c).[10]

_____

[10]    Plaintiff seems to suggest that the Second Circuit's decision in *Miller v. McDonald*, 130 F.4th 258 (2d Cir. 2025), which was subsequently vacated by the Supreme Court, *see*

Dr. Riccione relied on Sarah's MTHFR gene mutation, but there is no dispute that a MTHFR gene mutation is not listed as a contraindication or precaution to the Tdap vaccine by ACIP or any other acceptable standard. And while Dr. Cattelane listed "life threatening muti-organ failure after vaccinations" and "hypersensitivity to vaccines" and "allergies with adverse reactions"—which if true could qualify as an acceptable basis for a medical exemption—when pressed for additional information to support these claims, Plaintiff failed to comply. In other words, Plaintiff has no medical proof to support the claimed "multi-organ failure after vaccinations," "hypersensitivity to vaccines," or "allergies with adverse reactions." In fact, the medical proof in the form of her pediatricians' records suggests the exact opposite. (Dkt. 13-2 at ¶ 35; Dkt. 13-11; Dkt. 22).

Plaintiff contends that this constitutes "second-guessing" of Sarah's "treating physician's clinical judgment—retroactively deciding that her prior septic shock was 'not temporally associated' with vaccination and therefore irrelevant," (Dkt. 28 at 2), but

---

No. 25-133, 2025 WL 3506969 (U.S. Dec. 8, 2025), compels a school district to accept without question a physician's medical exemption form. (Dkt. 4-1 at 10-11). But that is not the law. *Miller* concluded that Public Health Law § 2164 was generally applicable, and the fact that the regulations required "sufficient information" and allowed the school district to request "additional information" did not mean that school district officials had "'discretion to approve or deny exemptions on a case-by-case basis' for *any* reason." 130 F.4th at 269. In other words, school officials lack the discretion to "decide which reasons for not complying with the policy are worthy of solicitude." *Id.* at 269 n. 14 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021)). Rather, the law sets forth objective criteria that must be met in order to qualify for a medical exemption, and in fulfilling their obligations under the law, school officials may request documentation and additional information to support a physician's certification that a vaccine is contraindicated. This does not mean that the law creates "a system in which school officials are given improper discretion to evaluate the reasons given for a requested medical exemption." *Id.* at 269.

Plaintiff has no right to create facts to support a claimed vaccine exemption.  In other words, if Sarah's physicians are going to make factual statements about why a vaccine exemption should be granted, those statements should be able to be backed up with actual medical proof.  This is not second-guessing of Sarah's treating physicians' medical judgment, but verification of the facts on which those physicians rely to reach those purported medical opinions.

In *Goe*, the Second Circuit affirmed the district court's dismissal of the plaintiffs' Rehabilitation Act claims, reasoning that the DOH regulations did not bar students with disabilities from schools because of their disabilities:

> Children who cannot be safely vaccinated because of their disability will receive a medical exemption and may attend school, so long as they can demonstrate a medical need, based on a national evidence-based standard, for an exemption.  Under the new regulations, a state-licensed physician can still certify the need for a medical exemption based on her clinical judgment, and *an exemption will be granted if that judgment is based on evidence (and not merely her say-so)* and is consistent with a nationally recognized evidence-based standard of care. . . .  [T]o the extent there is a disagreement on whether the requirements are met in any particular case, parents can appeal to the Commissioner of Education and seek judicial review in the state court system through an Article 78 proceeding.

43 F.4th at 36 (emphasis added).  Contrary to Plaintiff's attempts to distinguish *Goe* in her supplemental submission (Dkt. 28),[11] the Second Circuit's decision appears directly on point.  The plaintiffs in *Goe* alleged a variety of medical conditions that their physicians claimed justified their exemptions for vaccine requirements, including some of the same

---

[11]    Plaintiff suggests that *Goe* only involved a facial challenge to the medical exemption regulations.  (Dkt. 28 at 1).  But that is not correct.  *Goe* involved both facial and as-applied challenges.  43 F.4th at 34-35.

as alleged in Sarah's case, *see* 43 F.4th at 27 n. 8, and like in Sarah's case the medical exemption requests were denied based on the failure to meet objective criteria and relying on the school district's physician, *id.* at 27 ("Most of Plaintiffs' requests were denied. They were told by school officials, for example, that their requests lacked sufficient detail, did not meet ACIP Guidelines criteria, or were submitted on the wrong form. In denying these requests, many school officials relied on the opinion of their school district's physician."). The Second Circuit rejected claims that this set of alleged facts constituted discrimination based on a disability. *Id.* at 35-37.

The same is true here. The record in this case—one that Plaintiff agreed did not need to be expanded at an evidentiary hearing—establishes that Sarah was not excluded from the sixth grade because of her gene mutation or other alleged medical conditions. Rather, she was excluded because she did not receive the Tdap vaccine nor establish that she should be medically exempt from that vaccine by meeting the objective requirements of the Public Health Law and DOH regulations. As a result, Plaintiff has failed to establish a likelihood of success with her ADA and Rehabilitation Act claims. Thus, left with only a state-law Article 78 claim, Plaintiff should litigate her disputes through the avenue available under the Public Health Law (i.e., through an appeal to the Commissioner of Education and then, if unsuccessful, through an Article 78 proceeding commenced in state court). In other words, Plaintiff has failed to establish a likelihood of success in federal court, thus requiring denial of the request for a preliminary injunction.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion for a preliminary injunction (Dkt. 4) is

denied.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:        December 31, 2025
              Rochester, New York